# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DONAVETTE ELY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 13-0105-WS-B |
| | ) | |
| MOBILE HOUSING BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 63). The Motion has been briefed and is now ripe for disposition.[1]

---

[1]    The Court notes that plaintiff's summary judgment exhibits include the full transcripts of the depositions of Monica Griffin (doc. 73) and Donavette Ely (doc. 74). This submission runs afoul of the Local Rules, which specify that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." Local Rule 5.5(c). Furthermore, the Federal Rules of Civil Procedure specify that "[t]he court need consider only the cited materials" in the summary judgment record. Rule 56(c)(3), Fed.R.Civ.P. Accordingly, the Court will not sift through uncited materials in hopes of unearthing factual nuggets that might prove helpful to one side or the other. *See, e.g., Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1338 n.4 (S.D. Ala. 2010) ("[T]his Court will not scour uncited portions of the parties' evidentiary submissions for any scrap of evidence that may advance their positions.") (citations omitted); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."). Additionally, the Court's review of the summary judgment record has been hampered by both sides' failure to furnish citations to specific portions of the record to support specific statements of fact in their briefs. Applicable rules are clear that statements of fact must be "appropriately referenced to the supporting document or documents filed in the action." Local Rule 7.2(a)-(b); *see also* Rule 56(c)(1), Fed.R.Civ.P. This Court cannot and will not simply take counsel's word for it that particular unsupported facts are correct. *See, e.g., SE Property Holdings, LLC v. Rookery III*, 2013 WL 69030, *15 n.35 (S.D. Ala. Jan. 3, 2013) ("Counsel's *ipse dixit* … cannot be credited on summary judgment, in the absence of citations to evidence that might reasonably support it."); *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

## I.     Nature of the Case.

Plaintiff, Donavette Ely, brought this action against defendant, Mobile Housing Board, alleging constitutional deprivations, regulatory violations, and disability discrimination in connection with her participation and, more precisely, the termination of her participation in the Section 8 Housing Choice Voucher Program.  The Complaint (doc. 1) alleges that the Board is liable on the following legal theories: (i) violation of 42 U.S.C. § 1437(d)(k)(1) and (3) by not providing a pre-termination explanation of the grounds for termination or an opportunity to examine documents and records; (ii) violation of HUD regulations by not informing Ely of her right to a hearing and not providing an impartial hearing officer; (iii) a claim under 42 U.S.C. § 1983 for violation of the Fifth and Fourteenth Amendments by terminating Ely's housing benefits without due process, adequate notice or an opportunity to be heard; (iv) violation of the Fair Housing Amendment Act, 42 U.S.C. §§ 3604(f)(1)(A) and 3604(f)(3)(B), by discriminating against and refusing to make reasonable accommodation for Ely's disabled minor child; and (v) violation of  Title II of the Americans with Disabilities Act by discriminating against and refusing to make reasonable accommodation for Ely's disabled minor child.

## II.    Background Facts.

### A.     *Mechanics of the Section 8 Program.*

At all times relevant to this action, the Mobile Housing Board (the "Board") operated a Section 8 Housing Choice Voucher Program (the "Section 8 Program").  This Section 8 Program "allows the family to go out to rent from a private landlord.  [The Board] pay[s] a portion and the family pays a portion based on their income."  (Griffin Dep. (doc. 64-2), at 15-16.)  Eligible participants report their income on an annual basis, after which the Board confirms that data and computes the maximum rental amount via a mathematical formula.  (*Id.* at 16-17, 43.)  This annual calculation process is referred to as a "recertification."  (*Id.*)  The size of the voucher (*i.e.*, number of bedrooms) is determined by reference to a preexisting administrative plan that takes into account the income and specific demographic characteristics (age, gender, etc.) of the family composition of the household.  (*Id.* at 16-17, 43.)  The Board then issues a voucher to the participant for the designated number of bedrooms and the designated "shopping amount."  (*Id.* at 19-20, 43.)  This shopping amount represents the maximum monthly rental amount that a landlord can receive for the unit, regardless of whether the Board or the participant pays it.  (*Id.* at 43-45.)  Again, the Board determines the shopping amount pursuant to a predetermined

payment standard that considers the number of bedrooms and the participant's income.  (*Id.* at 19-20, 40.)

As Ely understood from her extensive experience in the Section 8 Program, the participant bears sole responsibility for shopping the voucher and reaching agreement with a landlord to accept the voucher.  (Ely Dep. (doc. 64-1), at 124-26.)  The Board maintained what it called a "courtesy vacancy list" of landlords who had expressed willingness to rent under the Section 8 Program, and shared that list with participants.  (Griffin Dep., at 47.)  The Board also directed participants to housing information sources such as the Apartment Guide, the Mobile Register, and so on.  (*Id.* at 48.)  Initial vouchers issued by the Board were valid for 60 days.  (*Id.* at 65.)  As a Board official put it, "We're holding a pot of money for the family to shop for a unit for 60 days."  (*Id.* at 37.)  If a participant fails to reach agreement with a landlord for a suitable unit within that 60-day period, the Board in its discretion may extend the voucher for additional 30-day increments (up to a maximum voucher duration of 120 days) for the participant to continue shopping.  (*Id.* at 65-66.)

Once the participant identifies a suitable unit and reaches agreement with the landlord, the Board contacts the landlord to schedule an inspection.  (*Id.* at 20.)  After the unit passes inspection, the Board makes a determination of rent reasonableness (essentially comparing the proposed rental rate to the unit's value), allows for rental negotiations with the landlord, and determines the relative rental portions of the Board and the participant.  (*Id.* at 21-22.)  Finally, the landlord executes a housing assistance payment contract (sometimes called the "HAP Contract").  (*Id.* at 22.)

### B.      *Plaintiff's History with the Program and the 2009 Voucher Request.*

Ely, a single mother of five children between the ages of 1 and 18, had participated in the Section 8 Program since in or about 1996.  (Ely Dep. (doc. 74), at 19-20.)  At all times relevant to this matter, Ely had only four children (her youngest was born in April 2012, after the events underlying this lawsuit took place).  Over the years, Ely had utilized Section 8 Program vouchers to rent housing at no fewer than five addresses.  (*Id.* at 22-26.)  She knew how the Program worked, and what her obligations were as a participant.  As of 2009, she was receiving a voucher from the Board for a three-bedroom unit.  (*Id.* at 37.)  At that time, Ely requested a voucher for a four-bedroom unit for medical reasons as an accommodation to her asthmatic eldest son, Devin Ely ("Devin").  (*Id.*)  As plaintiff explained the situation, "Devin wanted to be cold at all times,"

while neither Ely nor the younger children desired such chilly temperatures inside their home. (*Id.* at 40.) Ely's perception was that Devin "couldn't breathe if the heat was on" in the wintertime. (*Id.*) Based on this concern, Ely wanted a larger house so that "Devin would have his own room, and his own temperature setting." (*Id.* at 44.)

The Board's response when Ely raised this concern was that she needed to obtain a letter from a doctor. (*Id.* at 40.) Ely then submitted a letter from Dr. Mark Donahue of the Mobile County Health Department dated March 27, 2009. (Stokes Aff. (doc. 64, Exh. C), ¶ 4.) That letter stated in general terms that, "Due to multiple problems related to asthma, sleep apnea and weight, Devin would benefit from having separate thermostat controls in his bedroom." (Doc. 75, Exh. 4.) The Board notified Ely that the letter needed to be on the physician's letterhead. (Stokes Aff., ¶ 5.) So Ely submitted a second letter from Dr. Donahue, dated May 22, 2009 and printed on Health Department letterhead. (Doc. 75, Exh. 3.) In that letter, Dr. Donahue explained that Devin "has problems with chronic asthma," that "[a]sthma attacks can have many triggers, some being changes in temperature and stress," and that "[h]aving a separate room with separate temperature maintenance, may lead to lessening temperature related stress and thus decrease the likelihood of asthma flare-ups." (*Id.*) Notwithstanding those letters, Board caseworker Kimberly Stokes determined that Ely's family qualified for only a three-bedroom voucher, based on the following considerations: (i) the Section 8 Occupancy Chart allows for as many as six people to live in a three-bedroom unit; (ii) separate thermostats are not possible in Section 8 homes; and (iii) Devin's asthma could be accommodated by placing him in a separate bedroom with a window air-conditioner, and the other four family members could share the remaining two bedrooms. (Stokes Aff., ¶ 8.) On that basis, the Board issued a three-bedroom voucher to Ely on July 14, 2009. (*Id.*)

Ely requested a meeting to discuss the decision to issue her a three-bedroom voucher. (Doc. 75, Exh. 6.) Via letter dated July 28, 2009, the Board scheduled a meeting for August 13, 2009. (*Id.*) At that meeting (which Ely attended), Stokes' supervisor upheld the decision to issue a three-bedroom voucher. (Stokes Aff., ¶ 9.) Following the meeting, Ely submitted a handwritten request for "hearing," citing grounds of "unprofessionalism" and asserting that "my son's medical reasons were not considered." (Doc. 75, Exh. 5.) The Board originally scheduled the hearing for September 9, 2009, but later reset it for September 28, 2009 to accommodate Ely's request for additional time to obtain counsel. (Doc. 64, Exhs. G & H.) A letter dated

September 17, 2009 notified Ely that the hearing had been reset for September 28, 2009 at 2:30 p.m. at a specific location. (Doc. 64, Exh. H.) The September 17 letter further specified that, "If you fail to appear within 15 minutes of the scheduled time, the hearing will not be held or rescheduled." (*Id.*) Ely failed to appear at the designated hearing location at the appointed date and time. (Stokes Aff., ¶ 11.) In her deposition, Ely acknowledged her failure to attend what she called "a follow-up meeting" with Board officials. (Ely Dep., at 58.) Ely further conceded that she received the meetings and hearings she requested. (*Id.* at 65.)

### C. Plaintiff's Four-Bedroom Voucher in 2010.

As of early 2010, Ely resolved that she did not want a three-bedroom voucher and did not want to live in the three-bedroom home on Martin Drive that she was then renting. She wanted a larger place. (Ely Dep., at 62-63.) On March 26, 2010, Ely submitted to the Board a "Move Letter" indicating that she intended to leave her current Section 8 housing before her lease expired. (Doc. 75, Exh. 2.) Based on this announcement, and to facilitate her efforts to shop for housing, the Board prepared a new three-bedroom voucher for Ely on March 29, 2010, and expiring on May 28, 2010. (Doc. 64, Exh. I.) Ely persisted in requesting a four-bedroom voucher. Once again, she requested a four-bedroom voucher based on Devin's asthma; however, Ely never returned the reasonable accommodation form to support the request. (Doc. 64, Exhs. W, X, Y.) By Ely's own admission, this omission was because Devin's treating physician "felt uncomfortable" completing the form, which would have contained a medical certification that Devin "may not share a bedroom with another individual." (*Id.*)

Notwithstanding this setback, Ely ultimately got her wish. In May 2010, the Board issued Ely a four-bedroom voucher because "[her] family size and the ages of [her] children justified it." (Doc. 64, Exh. Y.)[2] On that basis, Board officials took the previously issued voucher for Ely, and made handwritten alterations to raise the number of bedrooms from 3 to 4 and to change the issue and expiration dates to 5/13/10 and 7/12/10, respectively. (Doc. 64, Exh. I.) Those changes were initialed by a Board employee on the voucher. (*Id.*) Ely appeared at the

---

[2] There is some confusion in the record as to the reason for issuance of the four-bedroom voucher. A separate letter from the Board dated May 11, 2010 states that Ely was being granted a four-bedroom voucher "[d]ue to the present medical condition of your son, Devin." (Doc. 75, Exh. 19.) Be that as it may, the important point is that the four-bedroom voucher was in fact issued, just as Ely requested.

Board offices at 10:05 a.m. on May 13, 2010, and was presented with her new voucher; however, she declined to take it. (Doc. 64, Exhs. J, K.) Plaintiff admits that she was issued a four-bedroom voucher on May 13, 2010, and that she refused to accept it because, in her words, "I wanted a voucher free of errors." (Ely Dep., at 68-69.) Ely was also unhappy with the "shopping amount" of $746.00 because she felt it should be higher. (*Id.* at 70-72.)[3]

For reasons not divulged in the record, Ely did not immediately voice her concerns about the new voucher to the Board. Instead, Ely waited until July 12, 2010, the voucher's expiration date, to notify her caseworker, Barbara Mitchell, that she had left the voucher at the front desk because she was unhappy with its appearance and the shopping amount. (Doc. 64, Exh. K.)[4] Notwithstanding this inexplicable delay, the Board granted her an extension and issued a new four-bedroom voucher for Ely on July 19, 2010, with an expiration date of September 18, 2010. (Doc. 64, Exh. N.) The Board notified Ely of this decision in writing on July 19, 2010 (attempts to reach Ely telephonically were unsuccessful because she did not answer her phone and her voicemail box was full). (Doc. 64, Exh. K.) The July 19 letter recited the expiration date of the voucher, then stated as follows: "Please pick-up the voucher as soon as possible. **No extensions will be granted upon the expiration date of the voucher.**" (*Id.* (emphasis in original).)

Plaintiff's evidence is that she experienced difficulty locating a four-bedroom unit within the maximum $746 monthly rental amount for which she had been approved. (Ely Dep., at 74-

---

[3]    It appears that Ely's voucher amount was calculated in the following manner: The Board began with a $1,141 monthly rent figure for a four-bedroom unit, using HUD payment standards based on the fair market rent. That figure was based solely on fair market rent for a four-bedroom unit. From that amount was subtracted a $395 monthly utility allowance, which is the Board's calculation of an average utility consumption for a four-bedroom unit. If the participant's income were high enough, the resulting $746 figure would be increased based on the participant's ability to contribute more in rent, subject to federal guidelines limiting the total percentage of a participant's income that may be spent on housing. But Ely's income was so low that she was left with the $746 figure. Other modifications could be made to the rental amount based on certain amenities (such as walk-in closets or central air conditioning) in the selected unit, following the inspection, but any such adjustments would be small. (Griffin Dep., at 58-63, 65, 67-68.)

[4]    In a handwritten document to Mitchell and dated July 12, 2010, Ely stated that she was "requesting an extension" because she "had a hard time locating 4 bedroom in our area for the voucher amount." (Doc. 64, Exh. L.) Ely also referenced her limited financial resources and her difficulty saving for deposits and moving expenses. The July 12 letter says nothing about Devin's asthma as contributing to the delay.

76.)  Ely spoke with Mitchell and other Board officials, requesting that her voucher amount be raised, but they declined to budge from the properly-calculated $746 maximum amount.  (Doc. 64, Exh. U.)  Shortly before her voucher expired, Ely found a home on Highland Woods Drive that she deemed suitable, and moved in even though the Section 8 Program procedures had not yet been completed.  (Ely Dep., at 73-77.)  Ely did not enter into a lease or agreement of any kind with the landlord at the Highland Woods address, but simply accepted on faith the landlord's vague statement that she would "work with" Ely.  (*Id.* at 80-81.)  Plaintiff and the landlord (who is not a party to this litigation) never reached an agreement as to rent.  (*Id.* at 84-85.)

On September 18, 2010, the date on which her voucher expired, Ely submitted to the Board a "Request for Tenancy Approval" on the Highland Woods house, listing a monthly rental amount of $1,200, some $454 above Ely's approved voucher amount.  (Doc. 64, Exhs. P, Q, R, U.)  This was so, even though Ely well knew that, in her words, "I cannot negotiate outside my voucher."  (Ely Dep., at 91.)  In other words, Ely knew that $746 was the maximum rental amount on which she could agree with a landlord, regardless of who the payee was.  And in September 2010, both Ely and her landlord signed a document acknowledging that the maximum rental amount the Board would pay would be $746, and that the rent could not exceed that amount.  (*Id.* at 98; doc. 75, Exh. 8.)[5]

On October 13, 2010, the Board issued a letter to Ely's landlord explaining that "[t]he maximum rent we can pay this year would be $746.00."  (Doc. 64, Exh. R.)  The October 13 letter elaborated that "[f]amilies are not allowed to pay additional amounts" above and beyond the Board's contribution under the Section 8 Program.  (*Id.*)  The landlord checked and signed a

---

[5]       Plaintiff characterizes the landlord's signature on this document as an agreement to charge no more than $746 in rent.  (Doc. 72, at 4-5.)  That is not a reasonable or accurate characterization, as the document in no way purported to specify the landlord's agreement to anything.  Plaintiff's own testimony was unequivocal that she never reached agreement with the landlord as to any specific rental rate for the unit.  Also, plaintiff testified that the landlord told her the fair market value was "probably worth more than that," that she told the landlord that Ely was going to request a recertification for a higher voucher amount, and that the landlord and the Board had negotiations outside her presence concerning the amount to be paid.  (Ely Dep., at 84-91.)  As such, plaintiff's attempt to frame this case as one in which a landlord agreed to rent a unit to her for $746, then subsequently reneged, is not supported by record evidence and is contravened by Ely's own sworn testimony.

box on the letter indicating that "[t]he maximum rent listed above is not acceptable." (*Id.*) Accordingly, the landlord did not sign a contract to rent a unit to Ely under the Section 8 Program. (Doc. 64, Exh. W.) Ely, who was already living in the Highland Woods house, never paid any rent to her landlord and never reached agreement as to a monthly rental amount. (Ely Dep., at 91, 96, 128.) In January 2011, the landlord commenced eviction proceedings against Ely for non-payment of rent. (Doc. 64, Exh. S.)[6]

### D.    *Plaintiff's Expired Voucher and Termination from the Program.*

In the meantime, Ely faced pressing problems with respect to her status in the Section 8 Program. Recall that when the Board extended her four-bedroom voucher in July 2010, it notified Ely that no further extensions would be granted beyond the September 18, 2010 expiration date. That date had now come and gone without Ely having submitted an acceptable Request for Tenancy Approval Form identifying suitable housing anywhere close to the financial constraints of that voucher. On September 27, 2010, the Board wrote to Ely, explained these circumstances, and stated that "[y]our final voucher expired on September 18, 2010." (Doc. 64, Exh. Y.) On February 1, 2011, the Board followed up with another letter to Ely, reiterating the pertinent facts and circumstances and concluding as follows: "Having exhausted all allowable extensions of your voucher, you are hereby terminated from the [Section 8] Program." (Doc. 64, Exh. U.)

In the February 1 letter, the Board notified Ely that she could contact Board housing manager Nancy Wilson telephonically to discuss the decision and, if she was unhappy with the outcome of that discussion, could request a hearing. (Doc. 64, Exh. U.) Ely requested a hearing. (Ely Dep., at 121.) On March 1, 2011, Wilson sent a letter to Ely explaining that Section XXXIX of the Board's Section 8 Administrative Plan does not require informal review after a "determination not to approve the … extension of a voucher term." (Doc. 64, Exh. V.) On that basis, Wilson wrote, "[t]he MHB has determined that you will not be granted any further voucher extensions. It has also been determined that you will not be granted an informal review of this decision." (*Id.*) Plaintiff's termination from the Section 8 Program thus became final in March 2011. Two years later, this litigation followed.

---

[6]    A default judgment was entered against Ely in the eviction matter on April 12, 2011, with Ely being given seven days to vacate the premises. (Doc. 75, Exh. 14.) Ely's ensuing appeal was dismissed with prejudice on July 25, 2011. (Doc. 75, Exh. 15.)

**III.    Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

**IV.    Analysis.**

As noted, Ely's Complaint asserts three categories of causes of action against the Board.  First, she brings a claim under 42 U.S.C. § 1983 alleging denial of due process, to-wit:  The Board "terminated Plaintiff's housing assistance payments without providing her with due process, and denied her adequate notice or a meaningful opportunity to be heard."  (Doc. 1, ¶ 30.)  Second, the Complaint alleges that the Board violated HUD requirements and regulations by (i) terminating her housing assistance payments "without first advising her of the specific grounds," (ii) failing to provide Ely "with an opportunity to examine any documents or records related to the termination," (iii) failing to inform Ely of her "option to pursue a formal hearing if a settlement is not reached in the informal conference hearing," (iv) failing "to provide an impartial hearing officer," and (v) allowing the hearing officer's decision to be "based completely on hearsay evidence."  (*Id.*, ¶¶ 24-27.)  Third, the Complaint asserts statutory claims for violation of what plaintiff calls the "Federal Housing Amendment Act" and the "American

Disabilities Act," grounded in allegations that the Board failed to provide reasonable accommodation for Ely's minor child's disability. Plaintiff's theory, as articulated in the Complaint, is that "Defendant was aware of the Plaintiff's minor child disability and the Plaintiff may need more time to locate suitable housing for her family," yet failed to provide an extension of her voucher. (*Id.*, ¶¶ 35, 39.) The Board has moved for summary judgment on each of these causes of action.

### A.    Due Process Claims.

Ely's § 1983 claim alleges that the Board violated her due process rights under the Fifth and Fourteenth Amendments by (i) "terminat[ing] Plaintiff's housing assistance payments without providing her with due process," and (ii) "den[ying] her adequate notice or a meaningful opportunity to be heard." (Doc. 1, ¶ 30.)

As a general matter, plaintiff is correct that recipients of Section 8 housing benefits are widely acknowledged to have a property interest in continued receipt of these benefits. *See, e.g., Swift v. McKeesport Housing Authority*, 726 F. Supp.2d 559, 574 (W.D. Pa. 2010) ("Plaintiff's Section 8 voucher, like welfare benefits, is a property interest for purposes of due process.").[7] In the landmark case of *Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that due process requires recipients of welfare benefits to be granted a pre-termination evidentiary hearing with certain procedural safeguards.[8] The Eleventh

---

[7]      *See also McCall v. Montgomery Housing Authority*, 809 F. Supp.2d 1314, 1324 (M.D. Ala. 2011) (noting lack of dispute that "recipients of public assistance, such as Section 8 assistance, have a protected property interest in continuing to receive such assistance"); *Stevenson v. Willis*, 579 F. Supp.2d 913, 919 (N.D. Ohio 2008) ("Plaintiff's participation in the § 8 Housing Choice Voucher Program … is a property interest protected by the requirement of procedural due process."); *Junior v. City of New York, Housing Preservation and Development Corp.*, 2013 WL 646464, *6 (S.D.N.Y. Jan. 18, 2013) ("It is well established that Section 8 tenants have a property interest in continuing to receive assistance payments.").

[8]      As the *Goldberg* Court explained, "when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process." *Goldberg*, 397 U.S. at 264. "[A] recipient [must] have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 267-68. Moreover, "the recipient must be allowed to retain an attorney if he so desires." *Id.* at 270. "Finally, the decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing." *Id.* at 271. "And, of course, an impartial decision maker is essential." *Id.*

Circuit has explained that the reasoning of *Goldberg* "applies with equal force to public housing assistance provided pursuant to Section 8, where eligible participants rely on subsidies to meet their basic need for housing." *Basco v. Machin*, 514 F.3d 1177, 1182 n.7 (11th Cir. 2008). The summary judgment record establishes that the Board did not grant *Goldberg*-style procedural safeguards to Ely before terminating her from the Section 8 program. For example, Ely received neither informal review nor a hearing on her challenge to the denial of further extensions of her four-bedroom voucher, even after she requested a hearing.

Notwithstanding the foregoing, the Board moves for summary judgment on Ely's due process claims on the ground that no process was due in this case. It is beyond cavil, of course, that no constitutional right to procedural due process lies in the absence of a protected liberty or property interest.[9] Defendant's argument hews to that principle as follows: "At the point when the Plaintiff failed to shop her voucher within 120 days and the voucher expired, her property interest protected by due process ceased." (Doc. 63, at 16.) Case authority supports this proposition. *See Burgess v. Alameda Housing Authority*, 2004 WL 958004, *2 (9th Cir. May 3, 2004) (finding that plaintiff lacked a constitutionally protected property interest in "a further extension of her Section 8 voucher, as such extensions were discretionary under the regulations in effect at the time"); *Chesir v. Housing Authority of City of Milwaukee*, 801 F. Supp. 244, 248 (E.D. Wis. 1992) ("Until the certificate or voucher expires, the family has a property right to continued participation in the program."); *Augusta v. Community Development Corp. of Long Island, Inc.*, 2008 WL 5378386, *7 (E.D.N.Y. Dec. 23, 2008) ("Because there is no genuine issue of material fact with respect to Augusta's voucher expiring on its own terms, I conclude that he was not denied due process."). Succinctly put, then, the Board's position is that Ely had no property interest in discretionary extension of her voucher beyond the 120-day limit, and that "the Plaintiff was not denied due process because she was not deprived of any property interest." (Doc. 78, at 7.)

---

[9]      *See, e.g., Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) ("A Section 1983 procedural due process claim requires a plaintiff to prove … a deprivation of a constitutionally-protected liberty or property interest."); *Behrens v. Regier*, 422 F.3d 1255, 1259 (11th Cir. 2005) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.") (citations omitted).

Defendant's conclusion that Ely was owed no due process with respect to her expired voucher is bolstered by regulations promulgated by the Department of Housing and Urban Development ("HUD"). The HUD regulations explain that in the Section 8 context, a public housing authority (or "PHA") such as the Board "is not required to provide a participant family an opportunity for an informal hearing for … a PHA determination not to approve an extension or suspension of a voucher term." 24 C.F.R. § 982.555(b)(4).[10] Likewise, those regulations specify that "[t]he PHA is not required to provide the applicant an opportunity for an informal review for … [a] PHA determination not to approve an extension or suspension of a voucher term." 24 C.F.R. § 982.554(c)(4).

In response, plaintiff does not challenge defendant's argument that a constitutionally protected property interest lapses when a Section 8 housing voucher expires. She neither distinguishes nor rebuts the persuasive authorities on which defendant relies. She identifies no case law supporting a contrary result (*i.e.*, that a Section 8 Program recipient retains a property interest even after a voucher expires by its terms). She points to nothing in either HUD regulations or the Board's administrative plan that would have entitled her to either a further extension of her voucher or a hearing based solely on her post-expiration request.[11] Instead, Ely's sole rejoinder to the Board's "property interest" argument is that the Board initially gave her the option of requesting informal review or a hearing, then rescinded same.[12] As plaintiff

_____

[10] In its briefs, the Board also repeatedly relies on regulations that it says are found at 24 C.F.R. § 887.165. (Doc. 63, at 10; doc. 78, at 6.) No such regulations exist, as Part 887 of Chapter VIII of Subtitle B of Title 24 of the Code of Federal Regulations is reserved, and has been since April 15, 1999. *See* 64 FR 13057 ("Part 887 is removed and reserved.").

[11] To the contrary, the Board has presented evidence showing that it allows vouchers to remain open for a maximum of 120 days and that its administrative plan (like the parallel HUD regulation) does not require hearings or even informal review of decisions not to extend a voucher term. Plaintiff received the full 120-day voucher period.

[12] Specifically, the February 1, 2011 letter from the Board to Ely concluded as follows: "Having exhausted all allowable extensions of your voucher, you are hereby terminated from the HCV Program. If you feel this determination was made in error, you may contact me at 434-2313 to discuss the matter. If you are not satisfied with the outcome of our discussion, you may request a hearing in the matter." (Doc. 76, Exh. 23.) The Board's February 1 letter promised nothing, and Ely has presented no evidence that she relied to her detriment on the Board's statements that she could call the housing manager and request a hearing if she wished. (Continued)

puts it, her position is that summary judgment should be denied on the due process claims because the Board "fails to explain why it would not be required to have a hearing once one was offered to Ely." (Doc. 72, at 17.) In essence, then, plaintiff's (undeveloped and unsupported) argument is that the Board's letter dated February 1, 2011 notifying Ely that she could request a hearing irrevocably estopped it from denying her a hearing and created a constitutionally protected property interest. The Court does not agree.

Absent extenuating circumstances not present here, constitutional law does not create property interests by estoppel. *See, e.g., Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) ("A constitutional entitlement cannot be created – as if by estoppel – merely because a wholly and expressly discretionary state privilege has been granted generously in the past.") (emphasis, internal quotation marks and citation omitted); *Bryan Media, Inc. v. City of St. Petersburg*, 2008 WL 4183933, *1 (11th Cir. Sept. 12, 2008) (concluding that plaintiff's estoppel argument did not give rise to a property interest, where plaintiff adduced no evidence that city's actions rose above mere negligence and made no showing of a serious injustice). Furthermore, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005). The Board never promised Ely a hearing. It never told her she was entitled to one. Applicable regulations and administrative plans conferred upon the Board broad discretion to determine whether to grant a hearing or not. Even if the Board had promised to give Ely a hearing, she cannot show reliance or injustice in a manner that might give rise to a colorable argument of equitable or promissory estoppel. The February 1 letter does not create a constitutionally protected property interest out of thin air. Yet plaintiff points to nothing else that might serve as a basis for a property interest underlying her due process claims.

When the smoke clears, what remains is this: The Board argues that Ely's due process claims fail as a matter of law because she had no property interest in further extension of an expired Section 8 Program voucher. Case authorities, federal regulations, and the Board's

---

By all appearances, plaintiff is attempting to seize opportunistically on an error in the February 1 letter to gin up a property interest that otherwise would not exist, even though nothing about that error prejudiced her.

administrative plan all bolster that conclusion. In response, plaintiff's only counterargument is that the Board could not deny her a hearing once it offered her one. That argument lacks legal or equitable support in the record and briefs, and will not be credited on summary judgment. On the record and arguments presented by the parties, the Court finds that Ely did not have a property interest in receiving Section 8 Program benefits after her voucher expired, by its plain terms. Absent a protectable property interest, plaintiff's due process claims brought under 42 U.S.C. § 1983 fail as a matter of law; therefore, summary judgment will be granted to defendant on those claims.

### B.     Claims Relating to HUD Regulations and Requirements.

Ely also brings separate claims against the Board for violating HUD regulations concerning notice and a hearing. In particular, Ely maintains that the Board failed to comply with the notice provisions of 24 C.F.R. § 982.555(c)(2) and the hearing requirements of 24 C.F.R. § 982.555.[13]

The glaring defect in Ely's claims predicated on the HUD regulations is that, on their face, those regulations are inapplicable here. Plaintiff cites the notice provisions of § 982.555(c)(2). (Doc. 72, at 11-13.) But that regulation is confined to "cases described in paragraphs (a)(1)(iv), (v) and (vi) of this section," which concern determinations that a family "is residing in a unit with a larger number of bedrooms than appropriate," that assistance for a participant family will be terminated "because of the family's action or failure to act," or that

---

[13]     In the Complaint, Ely also makes reference to alleged violations of 42 U.S.C. § 1437d(k)(1) & (3). That code section directs HUD to issue regulations that "require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure under which tenants will – (1) be advised of the specific grounds of any proposed adverse public housing agency action; … [and] (3) have an opportunity to examine any documents or records or regulations related to the proposed action." 42 U.S.C. § 1437d(k). Thus, any violation by the Board of § 1437d(k) would be subsumed within discussion of violation of HUD's implementing regulations promulgated pursuant to that statute. For that reason, the Court will not examine separately whether the Board violated § 1437d(k). If it complied with HUD's regulations, then it complied with the statute. If not, then it did not. Nothing in the parties' summary judgment briefs suggests otherwise; indeed, they contain no substantive discussion of § 1437d(k). For her part, plaintiff appears to acknowledge on summary judgment that her claims are governed by analysis of the regulations, not the statute, as follows: "The applicable statute for Section 8 housing entitlement subsidies, 42 U.S.C. § 1437f, contains no language as to the procedure to be used by a PHA for termination of these subsidy benefits." (Doc. 72, at 14-15.)

assistance will be terminated "because the participant family has been absent from the assisted unit for longer than the maximum period." § 982.555(a)(iv)-(vi), (c)(2). None of those circumstances are present here.[14] The Board's determination challenged by Ely was one "not to approve an extension or suspension of a voucher term." § 982.555(b)(4). That determination is expressly beyond the boundaries of the notice obligation set forth in § 982.555(c)(2); therefore, the Board was under no obligation to comply with the notice requirements of that regulation.[15]

Plaintiff also takes the Board to task because, she says, "if there is no right to request a hearing, the notice must so state." (Doc. 72, at 12.) She later repeats the argument, saying, "[I]f MHB's contention is that Ely was not entitled to a hearing then the notice was required to state that she was not entitled to a hearing." (*Id.* at 13.) Plaintiff provides no citation to any regulation or other authority for this purported "requirement." Of course, it is plaintiff's

---

[14]    Superficially, the subsection requiring notice for a determination that assistance will be terminated "because of the family's action or failure to act" might appear applicable to Ely's circumstances. Closer inspection reveals that this subsection (24 C.F.R. § 982.555(a)(v)) cross-references § 982.552, which allows for termination of program assistance on the following grounds: (i) violation of family obligations under the program as set forth in § 982.551, (ii) eviction from federally assisted housing in the last five years, (iii) previous termination of assistance under the program for any family member, (iv) commission of fraud, bribery or other corrupt or criminal acts in connection with a federal housing program, (v) rent or other amounts owed to the PHA, (vi) failure to reimburse a PHA for amounts paid to an owner for rent, damages to the unit, or other lease amounts owed, (vii) breach of an agreement with the PHA to pay amounts owed, (viii) failure to comply, without good cause, with FSS contract of participation, (ix) abusive or violent behavior toward PHA personnel, (x) failure to fulfill obligations under a welfare-to-work voucher program, or (xi) criminal activity or alcohol abuse. *See* 24 C.F.R. § 982.552(c)(i)-(xi). No determination was made by the Board that might conceivably fall within those parameters; therefore, § 982.555(a)(v) is inapplicable in this case and cannot form a basis for imputing the notice requirement to the Board's determination not to extend Ely's voucher.

[15]    Besides, to the extent that Ely is complaining that the Board never provided notice containing "a brief statement of reasons for the decision," § 982.555(c)(2)(i), undisputed record facts are to the contrary. A letter from the Board to Ely dated September 27, 2010 explains in substantial detail that her voucher was expired, and references the July 19 letter specifying that no further extensions would be granted. (Doc. 64, Exh. Y.) And a letter from the Board to Ely dated February 1, 2011 explains that she was being terminated from the program because she had "exhausted all allowable extensions of [her] voucher." (Doc. 64, Exh. U.) A third letter from the Board to Ely dated March 1, 2011 explains why it was denying her request for a hearing on the voucher extension issue. (Doc. 64, Exh V.) Plaintiff does not explain why she thinks these three written notices are insufficient under § 982.555(c)(2)(i), even if that regulation applied.

obligation to furnish the Court with citations of authority in support of her legal arguments. Yet she has not done so. As such, the Court is unable to discern any viable legal basis for plaintiff's claim that the Board violated HUD requirements by failing to notify her that she was not entitled to a hearing contemporaneously with its determination that no further extensions to her voucher would be granted.

Next, plaintiff argues that the Board violated the hearing requirements of § 982.555. (Doc. 72, at 13-18.) Again, that regulation expressly provides that a PHA need not provide an informal hearing for a "determination not to approve an extension or suspension of a voucher term." 25 C.F.R. § 982.555(b)(4). That is precisely the determination at issue in this case. The Board found that Ely's voucher was expired and that no further extensions would be granted. That determination falls squarely within the confines of § 982.555(b)(4); therefore, the Board could not have violated that regulation by not providing her a hearing. Defendant is entitled to summary judgment on this claim, as well.

In a last-ditch effort to bolster this cause of action, plaintiff contends that her claims as to regulatory violations are well-founded because "Griffin, MHB's corporate representative[,] admitted that regulation [*sic*] were not followed and that procedures were not handled properly in Ms. Ely's case." (Doc. 72, at 17-18.) Plaintiff cites to no specific pages of Monica Griffin's deposition in this case, but would apparently refer the Court generically to the entire 71-page transcript. This is procedurally improper. *See* Rule 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … ***citing to particular parts of materials in the record***") (emphasis added). The Court has no idea what portion of Griffin's transcript plaintiff relies on for this startling proposition. This argument is not and cannot be credited on summary judgment to save these claims from dismissal.[16]

---

[16]     Griffin's testimony was emphatic that she could not address why Ely was not granted an extension under these circumstances because she was not the manager making those decisions. (Griffin Dep., at 38.) She testified that, "[g]enerally, an extension would be granted and the person would be given paperwork to shop for another unit." (*Id.*) But she certainly did not testify that the regulations require such a result or that it was a perversion of the program for that not to happen in Ely's case. Again, Griffin was not familiar with the specifics of why Ely's case was handled as it was; therefore, she could not explain certain particularities about which plaintiff's counsel questioned her. She did testify quite clearly, however, that when things do not work out for a tenant and a particular unit, the voucher will be extended "[i]f they have not exhausted their 120 days." (Griffin Dep., at 37.) That's just it: Ely had already exhausted her
(Continued)

To the extent that plaintiff argues that the Board violated HUD regulations or requirements by not providing further extensions beyond the 120 days Ely was granted to shop her voucher, such a claim cannot survive scrutiny, either. Applicable HUD regulations specify that "[t]he initial term of a voucher must be at least 60 calendar days." 24 C.F.R. § 982.303(a). Plaintiff's voucher plainly satisfied that criterion. Moreover, those regulations go on to state that, "[a]t its discretion, the PHA may grant a family one or more extensions of the initial voucher term in accordance with PHA policy as described in the PHA administrative plan." *Id.* § 982.303(b)(1). Thus, the Board's decision of whether or not to allow Ely extensions of her voucher beyond the initial 60-day term was discretionary, with such discretion being cabined by the Board's own policy. The only evidence before the Court on summary judgment is that Board policy provided for a maximum term of 120 days for vouchers in the Section 8 Program. (Griffin Dep., at 65-66.) Plaintiff identifies no genuine issues of fact as to whether the denial of further voucher extensions to Ely ran afoul of Board policy or otherwise abused the Board's discretion granted by HUD regulations; therefore, any claim by Ely that the Board violated HUD requirements by not extending her voucher beyond the 120-day period must fail.[17]

## C. Disability Discrimination / Failure to Accommodate Claims.

Plaintiff's final category of claims asserted against the Board sounds in theories of disability discrimination and failure to provide reasonable accommodation. Such claims were

---

120 days. Griffin was unequivocal in her testimony that 120 days is "the total amount of time that we hold, we save that pot of money for a family to find a unit," and that during that 120-day period, the participant should complete the entire process (including finding a unit and passing all inspections). (*Id.* at 70-71.) Griffin further testified that Ely was not granted a hearing on the extension issue because the Board's administrative plan did not require it. (*Id.* at 49-50.) Far from lending credence to plaintiff's claims of procedural violations, then, Griffin's testimony squarely supports the Board's position on these HUD regulation causes of action.

[17] To be sure, HUD regulations do oblige PHAs to provide extensions of the voucher term as a reasonable accommodation for a disabled family member. *See* 24 C.F.R. § 982.303(b)(2) ("If the family needs and requests an extension of the initial voucher term as a reasonable accommodation … to make the program accessible to a family member who is a person with disabilities, the PHA must extend the voucher term up to the term reasonably required for that purpose."). The trouble with this argument is that, as discussed *infra*, plaintiff's evidence shows neither that she needed nor that she requested an extension of the voucher term as an accommodation for her son's asthma. As such, the Court finds no triable issues of fact on any claim Ely may be asserting that is predicated on alleged violation of § 982.303(b)(2).

purportedly brought under the Fair Housing Amendments Act of 1988 ("FHAA"), as codified at 42 U.S.C. § 3604, and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA").[18] "Due to the similarity of the ADA and the FHA's protections of individuals with disabilities in housing matters, courts often analyze the two statutes as one." *Caron Foundation of Florida, Inc. v. City of Delray Beach*, 879 F. Supp.2d 1353, 1364 (S.D. Fla. 2012).

The Complaint makes clear that Ely's disability discrimination claims are rooted in the contention that the Board "was aware of [Devin's] disability and the Plaintiff may need more time than the normal person to locate suitable housing for her family," but that the Board nonetheless "refused to provide the Plaintiff with any additional extensions for her four (4) bedroom voucher." (Doc. 1, ¶¶ 35, 39.) Plaintiff reiterates this argument in her brief, insisting that the Board failed to reasonably accommodate her son's disability by declining to extend her voucher. (Doc. 72, at 22.)[19]

---

[18]     Plaintiff's summary judgment brief maintains that her disability discrimination claims are also brought pursuant to Section 504 of the Rehabilitation Act. (Doc. 72, at 19-21.) Plaintiff cites paragraphs 73 through 75 of her Complaint for this proposition. (*Id.* at 21.) But the Complaint lacks any such numbered paragraphs, and is devoid of references to the Rehabilitation Act. It is improper for a litigant to invoke a previously unpleaded statutory cause of action on summary judgment. *See, e.g., Miccosukee Tribe of Indians of Florida v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."). For that reason, the Court does not consider plaintiff's Rehabilitation Act arguments on the merits, as no claims under that statute have been joined herein.

[19]     Ely's brief also attempts to inject a new reasonable-accommodation theory, to-wit: That the Board is liable for disability discrimination because it "fail[ed] to raise the amount of voucher payment" as an accommodation for Devin's disability. (Doc. 72, at 22.) This claim nowhere appears in the Complaint. Again, it is improper and impermissible for a plaintiff to use her summary judgment brief as a vehicle for *de facto* amendment of her pleadings. *See, e.g., American Federation of State, County and Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment or one advocating summary judgment.") (citation and internal quotation marks omitted); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). Accordingly, the Court does not consider plaintiff's unpleaded disability discrimination claim(s) relating to failure to increase the voucher amount. Even if such claims were properly joined in this action, the Board would be entitled to summary judgment because the record is devoid of evidence that Ely's requests for a larger shopping amount were in any way related to Devin's disability, that the market rent for a four-bedroom unit that reasonably accommodated Devin's asthma would be higher than that for (Continued)

In the housing context, the law is clear that "the duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (citation omitted). That is to say, a defendant "cannot be liable for refusing to grant a reasonable and necessary accommodation if the [defendant] never knew the accommodation was in fact necessary." *Id.* (citation omitted). Although a request for accommodation need not employ "magic words," the defendant "must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [landlord] to make appropriate inquiries about the possible need for an accommodation." *United States v. Hialeah Housing Authority*, 2011 WL 989815, *3 (11th Cir. Mar. 22, 2011) (citation omitted). "Simply put, a plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA." *Schwarz*, 544 F.3d at 1219.

Plaintiff's disability discrimination claims under the FHAA and the ADA suffer from a systematic failure of proof in multiple respects. First, the record shows that the Board lacked knowledge of Devin's health condition as of spring 2010. Even after the Board reminded her in writing, plaintiff failed or refused to return the medical verification for her reasonable accommodation request at that time (which was that Devin required a separate bedroom), and admitted that Devin's physician was not comfortable completing the form. (Doc. 64, Exhs. W, X.) Without that medical information, the Board could not know whether Devin was then disabled and, if so, what accommodations he might require. Second, the summary judgment record is devoid of evidence suggesting any linkage between Ely's son's health condition and the length of time it took her to locate a four-bedroom unit.[20] Stated differently, the record taken in

_____

a four-bedroom unit that did not, or that the Board had any reason to know of a nexus between Devin's health condition and Ely's demands for a bigger shopping amount.

[20] Applicable law is clear that a plaintiff bringing a claim of disability discrimination in housing based on failure to provide reasonable accommodation must show "a refusal to make reasonable accommodations in rules, policies, practices, or services, ***when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling***." 42 U.S.C. § 3604(f)(3)(B) (emphasis added); *see also* 24 C.F.R. § 982.303(b)(2) ("If the family needs and requests an extension of the initial voucher term as a reasonable accommodation … to make the program accessible to a family member who is a person with (Continued)

the light most favorable to Ely does not support a reasonable inference that Devin's condition had any deleterious impact on Ely's ability to shop the voucher.[21]  Plaintiff's insistence in her Complaint that Devin's disability meant that "the Plaintiff may need more time than the normal person to locate suitable housing for her family" (doc. 1, ¶¶ 35, 39) is a premise that is utterly lacking in factual support in the summary judgment record.  Of course, plaintiff's bare say-so in her pleading is not sufficient to overcome Rule 56 scrutiny.[22]

Third, even if plaintiff's evidence could support a reasonable inference that Devin was disabled in mid-2010 and that his disability somehow impaired Ely's ability to shop the Section

---

disabilities, the PHA must extend the voucher term up to the term reasonably required for that purpose.").  In other words, Ely must show that an extension of her voucher was necessary to afford her family (and specifically her son Devin) an equal opportunity to access and participate in the Section 8 Program.  No facts before the Court would support a conclusion that program participants with asthmatic family members require longer periods of time to shop their vouchers than program participants without asthmatic family members, either in general or in Ely's specific circumstances.  Yet Ely's disability discrimination claims against the Board hinge on that very notion.

[21]     There is no evidence, for example, that prospective landlords expressed reluctance to rent a unit to a family with an asthmatic child.  Nor is there evidence that Ely's efforts to shop the voucher were stymied because no available units were suitable for Devin.  Instead, plaintiff's own evidence shows the following: (i) she squandered the first 60 days of the four-bedroom voucher by refusing to pick it up from the Board's offices, despite actual knowledge that it was available and waiting for her (Ely Dep, at 68-69); (ii) during the second 60 days, prospective landlords were unwilling to deal with her because they could command a higher rent amount from non-Section 8 sources (*id.* at 74-76); and (iii) she moved into a house with a landlord who demanded $1,200 in rent, more than $400 above her voucher amount.  By plaintiff's own narrative, these are the facts and circumstances that caused her not to complete the voucher shopping process within the allotted 120 days.  No reasonable fact finder could conclude that those facts and circumstances have anything to do with, or were exacerbated in any way, by the fact that Ely's son suffers from asthma.

[22]     The same is true of counsel's assertion in plaintiff's summary judgment brief that the Board had a "policy of denying Section 8 voucher extensions and increases in voucher amounts to those who are having difficulty finding suitable housing due to a disability."  (Doc. 72, at 27.)  Plaintiff points to no evidence from which a reasonable finder of fact might be able to infer that Ely was "having difficulty finding suitable housing *due to a disability*," as opposed to some other reason (such as unfavorable market conditions, unreasonable expectations by plaintiff, or failure to shop the voucher with reasonable diligence during the four-month period provided); therefore, this conclusory statement cannot and will not be credited on summary judgment.

8 Program voucher in a timely manner, summary judgment would remain appropriate on this category of claims. The reason is that Ely never requested an extension of her voucher as a reasonable accommodation.[23] Now, the Court is well aware that a plaintiff need not use talismanic language to invoke the reasonable accommodation provisions of the FHAA or the ADA. However, she must do something to make the defendant aware of a connection between her request and the underlying disability (or the nexus must be obvious). Here, Ely did not do so. To be sure, she did ask the Board to grant her an extension on her voucher. But she said or did nothing to place the Board on notice that her request for extension had anything to do with Devin's medical condition. The summary judgment record lacks evidence that Ely ever complained to the Board (or that the Board had any reason to suspect) that Devin's asthma somehow delayed, complicated or hindered her efforts to shop the four-bedroom voucher during the designated 120-day period (the initial 60 days plus the 60-day extension). Taken in the light most favorable to plaintiff, the record simply cannot support a reasonable inference that the Board knew or had any reason to believe that Ely's delays in shopping her voucher were connected to Devin's asthma, or that she was requesting an extension of the voucher as an accommodation for his disability.[24] Accordingly, the Board is entitled to summary judgment on plaintiff's claims of disability discrimination / failure to accommodate, whether postured under the FHAA, the ADA, or any other statutory or regulatory scheme.

---

[23] As defendant accurately put it, "The only request made by the Plaintiff was for a hearing to review the Mobile Housing Board's decision to deny any further extension to her Housing Choice Voucher." (Doc. 78, at 8.) So Ely told the Board she wanted a hearing on the denial of her extension, but there is no indication in the record that she ever told the Board she needed a further extension as an accommodation for Devin's asthma because it was taking her longer to shop the voucher than it would for a program participant without an asthmatic family member.

[24] The summary judgment record does reflect that Ely requested a fourth bedroom as an accommodation for Devin's disability; however, that request cannot form the basis of an actionable claim under the FHAA or the ADA. The record shows that, even with plaintiff's insufficient medical documentation, the Board granted plaintiff a fourth bedroom on her voucher in May 2010. That is the only accommodation that Ely ever requested from the Board that she linked in any way to Devin's medical condition, and it was granted.

**V.      Conclusion.**

For all of the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 63) is **granted**.  There being no genuine issues of material fact as to any claim or cause of action asserted herein, this action is **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 7th day of April, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE